## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **EMILY BORCHARDT,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | **CIVIL ACTION NO. 1:19-cv-891** |
| | § | |
| **vs.** | § | |
| | § | |
| **MELINDA MONTFORD;** | § | |
| **MARGARET MOORE; and** | § | |
| **TRAVIS COUNTY, TEXAS;** | § | |
| | § | |
| *Defendants*. | § | |

## ORIGINAL COMPLAINT

### INTRODUCTION

1.      Plaintiff Emily Borchardt is a survivor of sexual assault. After being strangled, abducted, and held by three men against her will for approximately twelve hours, Emily reported to the Austin Police Department ("**APD**"), immediately after her escape, that her assailants raped her multiple times. Emily then underwent an invasive search of her body for evidence and cooperated with law enforcement at every step of the investigative process. From the moment Emily reported the criminal sexual assaults to the APD, to her formal written and verbal statements to the APD, to her allegations in a related class-action lawsuit on behalf of female sexual assault survivors in Travis County (the "**Class-Action Lawsuit**"), Emily has steadfastly and consistently maintained the truth: She was sexually assaulted multiple times by multiple strangers, and nothing she did during those hours of torture was consensual.[1]

---

[1]      The Class-Action Lawsuit is currently pending in the United States District Court for the Western District of Texas as Civil Action Number 1:18-cv-505. This lawsuit is distinct from, but related to, the Class-Action Lawsuit. Plaintiff therefore requests that the Court take judicial notice of it.

2.      This truth is reflected throughout the incident report file maintained and provided by the APD (the "**APD's Police File**"). Nevertheless, Travis County's First Assistant District Attorney Melinda "Mindy" Montford ("**ADA Montford**") and Travis County's District Attorney Margaret Moore ("**DA Moore**") publicly stated, both directly and implicitly, that Emily is lying about the sexual assaults, that Emily simply does not want her family to know the "truth" about those sexual assaults, and that Emily admitted to law enforcement that she consented to sex with her assailants.

3.      In short, this lawsuit is necessary because ADA Montford and DA Moore *lied about a victim of sexual assault* to her friends, family, and the public. They lied about Emily in an attempt to undermine her character and credibility in her loved ones' eyes and to prevent or dissuade Emily from pursuing her claims in the Class-Action Lawsuit, which was (and is) a threat to both DA Moore's reelection campaign and ADA Montford's continued service as First Assistant District Attorney.

4.      That ADA Montford and DA Moore publicly lied about Emily is, quite simply, appalling. It is also illegal under both federal and state law. ADA Montford and DA Moore are duty-bound to provide equal protection and due process to Emily. And they—like all individuals in Texas—are also prohibited from defaming her. ADA Montford's and DA Moore's steadfast refusal to fulfill either of those obligations, and their decisions to instead actively conspire to violate them, must be remedied.

<u>PARTIES</u>

5.      Plaintiff Emily Borchardt resides in Texas and may be served via the undersigned counsel of record.

6.      Defendant DA Moore resides in Texas and may be served at the Travis County District Attorney's Office, 509 West 11th Street, Suite 1.700, Austin, Texas 78701.

7.      Defendant ADA Montford resides in Texas and may be served at the Travis County District Attorney's Office, 509 West 11th Street, Suite 1.700, Austin, Texas 78701.

8.      Defendant Travis County is a political subdivision of the State of Texas. Travis County is responsible for the actions of the Travis County District Attorney's Office (the "**DA's Office**") and may be served via Judge Sarah Eckhardt, 700 Lavaca Street, Suite 2.300, Austin, Texas 78701.

9.      Where appropriate, Travis County, DA Moore, and ADA Montford are referred to collectively as "**Defendants**."

<u>JURISDICTION AND VENUE</u>

10.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

11.      Venue is proper in this Court under 28 U.S.C. § 1391 because the events that give rise to the causes of action in this lawsuit occurred within the parameters of the Western District of Texas, Austin Division. Venue is also proper because the Defendants' violations under color of law, acts, and/or omissions occurred in this district.

12.      This lawsuit is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, and the common law of the State of Texas.

**FACTS**

13.     Plaintiff Emily Borchardt incorporates the preceding paragraphs as if set forth fully herein.

14.     In January 2018, Emily was a senior honors student at the University of Texas at Austin. Over a period of more than twelve hours on the weekend before she was to begin her final semester of college, Emily was abducted, strangled, and repeatedly raped in Travis County, Texas. After she finally escaped her three assailants, Emily immediately reported the sexual assaults to the APD, submitted to a rape kit examination and search, and provided her full cooperation to both the APD and the DA's Office. This is so despite the impact of the multiple traumas she had endured at the hands of her criminal assailants. In other words, while dealing with severe personal trauma in the immediate aftermath of multiple sexual assaults, Emily openly and honestly cooperated with law enforcement to ensure that her assailants, who are known to both the APD and the DA's Office by name, could be investigated, arrested, and prosecuted.

15.     The APD's Police File indicates—at least twenty-six times—that Emily feared for her life, was assaulted and strangled, repeatedly tried to escape her assailants, and did not consent to having sex with anyone during the twelve hours of torture that she endured. One of her assailants told Emily that he had been in prison for murder, and the other two assailants told Emily that another man in one of the motel rooms in which she was held had also killed people. The APD's Police File is replete with records that establish Emily was held and sexually assaulted against her will. And nothing in the APD's Police File indicates that Emily ever stated otherwise. To be absolutely clear, no portion of the APD's Police File evinces Emily admitting that she consented to any sexual act perpetrated on her, and both the APD and the DA's Office have access to that file.

16.     Despite both Emily's cooperation and corroborating physical evidence (including DNA evidence identifying the man who told Emily that he had previously been convicted of murder), the DA's Office declined—on two separate occasions—to prosecute any of the sexual assaults that Emily reported. Following the second refusal of the DA's Office to take her case, Emily became a named plaintiff in the Class-Action Lawsuit on August 1, 2018.  The Class-Action Lawsuit seeks redress for, among other things, the DA's Office's pattern of failing to properly investigate and prosecute reported sexual assaults that are perpetrated upon women. Not surprisingly, the Class-Action Lawsuit put tremendous pressure on the DA's Office and the prosecutors responsible for Emily's case, namely DA Moore and ADA Montford. That is because, among other things, the press' coverage of the Class-Action Lawsuit casts the Defendants in a negative light, poses a threat to DA Moore's reelection campaign, and poses a threat to ADA Montford's continued service as DA Moore's First Assistant District Attorney.

17.     A little over a month after Emily joined the Class-Action Lawsuit, on September 14, 2018, ADA Montford returned a three-week old message from a friend of Emily's family (the "**Third Party**"). The Third Party recorded the conversation to make sure that she remembered its details.[2] Among other malicious and unethical claims and statements, ADA Montford made the following factual statements about Emily during the recorded conversation, all of which are false:

- "[Emily] admits [that] she had consensual sex with the guy in the second room, with the shower and all that. She tells the detective I had sex with him and it was consensual." Exhibit A at 8:14–16.

- "[A]t the end of the day, they go and they get the DNA from the rape kit that was done, and there's only one, the presence of DNA from one male, and it's the guy that [Emily] says was consensual. So the guy next door, his DNA is found in her rape kit, ok? But that's

---

[2]     A true, accurate, and lightly redacted copy of the September 14, 2018 call transcript is attached as **Exhibit A**. Exhibit A is not confidential because, as explained in more detail *infra*, it was published by the press, publicly ratified by DA Moore, and filed by the Defendants in other legal proceedings.

the guy who [Emily] says it was consensual, he says it was consensual, there's not a rape there." *Id.* at 8:23–9:3.

- "[I]f you believe [Emily's] version of what happened, then you have to believe the rape happens in one room, and then she goes and after the rape, has consensual sex with another guy." *Id.* at 9:14–16.

- "I don't know if they collected, you see they wouldn't have [collected physical evidence] in the second room because once both parties say it's consensual they're not going to take any evidence out of that, other than his DNA." *Id.* at 11:19–21.

- "[Emily] admittedly ha[d] consensual sex after she was just raped." *Id.* at 12:10.

- "Um, the fact that she goes right next door and now, if she was saying it wasn't consensual, that's one thing…. But she says it was consensual." *Id.* at 13:12–15.

- "So, in both of [Emily's] statements it was consensual sex in the second room." *Id.* at 13:18–19.

- "But [Emily] definitely says it was consensual. Uh, and then, of course, you have the DNA issue where you've got the first, the consensual guy's DNA . . . ." *Id.* at 14:1-3.

The investigative records contained within the APD's Police File, which ADA Montford had access to and even implies that she studied just before her improper call to the Third Party, contradict all of these statements. Emily did not consent, and she never said she did. The former makes what happened to Emily rape; the latter makes what ADA Montford said both a violation of Emily's civil rights and *per se* defamation.[3]

      18.     During the call in which she repeatedly lied about Emily, ADA Montford noted that she was extremely familiar with Emily's case. For example, ADA Montford stated that she (i)

---

[3]    In fact, in one part of the audiotaped police interview, Emily challenges the detective as to why or how anyone could believe a consent defense given that the only portions of the APD's Police File that could even suggest that Emily consented are self-serving statements made by Emily's assailants that are contradicted by other evidence. Statements made by one of the men are notably incredible. On the night that Emily was raped, he stated that he did not recognize Emily and that Emily never entered his room. However, surveillance footage showed Emily exit his room, and Emily accurately described him. Indeed, the APD's Police File proves that the APD was able to correctly identify him based on Emily's description, and that he exited one of the rooms in which she had been held. Approximately three months later, he again told the APD that he never had contact with Emily. However, after the APD told him that DNA evidence would prove that he had sexual contact with Emily, he then changed his story and claimed that Emily consented to having sex with him.

"actually staffed [Emily's] case," *id.* at 1:21–24; (ii) "talked to the detective and then [DA Moore about] the case" to make sure that she was "in the loop," *id.* at 2:3–6; and (iii) "reviewed [Emily's matter and her notes]" just before the improper call, *id.* at 6:7–8.

19.     ADA Montford's misconduct—calling the Third Party and repeatedly lying about a sexual-assault survivor—is, charitably put, appalling. What is worse, however, is that it appears that ADA Montford did so in order to silence that sexual-assault survivor, undermine her to her family and friends, and intimidate her into dropping out of the Class-Action Lawsuit. For example:

- ADA Montford made the September 14, 2018 call approximately six weeks after Emily joined the Class-Action Lawsuit, which ADA Montford refers to on the call several times. *See, e.g.*, *id.* at 5:1–14, 15:8–18, 17:18–18:9, 21:15–17, 25:20–24.

- ADA Montford made it clear during the call that she believed the Class-Action Lawsuit was a problem. For instance, she chastised the plaintiffs in the Class-Action Lawsuit (including Emily) for, in her words, "acting in ways that I don't think are appropriate for victims" and "creat[ing] fear in people." *Id.* at 23:9–14.

- The Third Party that ADA Montford called was a friend of Emily's family, who ADA Montford believed would report back to the family. *See, e.g.*, *id.* at 2:18–5:25 (illustrating that ADA Montford was willing to divulge information that she knew she was "not really supposed to be talk[ed] about . . . publicly" so that the Third Party could "talk to [Emily's] family"). Indeed, ADA Montford counseled the Third Party specifically regarding how to approach Emily's family. *Id.* at 5:24–6:5.

- In so doing, ADA Montford, on multiple occasions, stated that she was willing to discuss Emily's case fully with Emily and Emily's family ***after*** the Class-Action Lawsuit was resolved. *See, e.g.*, *id.* 15:10–18 ("And, if there wasn't a damn lawsuit in place . . . I'd be sitting down here talking to [Emily and Emily's family] right now just like I'm talking with you. . . . I'm happy to do that after the lawsuit is over. You know, once there's no exposure on either side, I'm happy to sit down and talk with them.").

- ADA Montford also implied that embarrassing details about Emily would come to light if Emily continued to pursue her rights via the Class-Action Lawsuit. *See, e.g.*, *id.* at 6:2–5 ("I think [Emily's family] would be mortified about some of this stuff about their daughter, so I don't want, um, I don't want to hurt them any more than they've already been hurt, but, um, anyway, because it's you I'm going to tell you kind of the nuts and bolts of it. Um, so you knew what we were up against.").

In short, ADA Montford intended her call to preserve the Defendants' reputations, to protect their political ambitions, to malign Emily to her family and friends, and to prevent Emily from pursuing her constitutional rights in the Class-Action Lawsuit.

20.     What is more, DA Moore then reviewed and publicly ratified ADA Montford's misconduct. On March 4, 2019, the call transcript was published by the press in connection with an article entitled "Sexual Assault Survivor Accuses Travis County Prosecutor of Lying About Her Case." The next day, the article was updated to reflect DA Moore's comments concerning the call transcript.[4] Specifically, DA Moore said that she had read the September 14, 2018 call transcript and that "allegations of impropriety [concerning the call transcript] are unfounded." Ex. B. DA Moore went on to defend her First Assistant District Attorney by stating that "Ms. Montford believed she was providing information to Ms. Borchardt through an intermediary acting on Borchardt's behalf." *Id.* Evidently, the fact that ADA Montford intended for the Third Party to repeat ADA Montford's lies to Emily and her family made ADA Montford's behavior acceptable to DA Moore.

21.     That DA Moore, who is responsible for training and overseeing all prosecutors under her purview, publicly affirmed ADA Montford's actions is shocking because the call transcript contains blatant ethical misconduct, privacy violations, and *per se* defamatory statements. It also appears that ADA Montford's actions violated the policies of the DA's Office. First, DA Moore's own interagency task force for addressing deficits in the sexual assault investigation and trial systems, about which she presented to the Travis County Commissioners' Court on February 4, 2019, has an explicit policy forbidding such disclosures without a voluntary

---

[4]      A true and accurate copy of the updated March 4, 2019 article, which includes both DA Moore's commentary and a link to the call transcript, is attached as **Exhibit B**.

waiver from the victim.[5] Yet, DA Moore neither reprimanded nor disciplined her First Assistant District Attorney for violating Emily's confidentiality and privacy rights. These facts raise strong inferences that ADA Montford's and DA's Moore's efforts were coordinated, that DA Moore already knew that ADA Montford made the improper call, and that the pair had in fact conspired to have ADA Montford call the Third Party. There is not, nor can there be, a proper motive for disparaging a victim of sexual assault by lying about her.

22.     Moreover, when confronted by a reporter about the recording of the call, the DA's Office determined that it would require a waiver from Emily in order to discuss the case and the materials contained in the APD's Police File with that third party.[6] Thus, it is clear that the Defendants knew it was unethical and improper to discuss sensitive information about a victim of sexual assault with any third party without that victim's consent—even if the information shared was true. They cannot have believed it was ethical, appropriate, or in line with their obligations as prosecutors to share false information about a victim in order to humiliate and intimidate her.

23.     Beyond the criminal assaults themselves, and beyond the aftermath of her negative experiences with the APD, Emily was traumatized and harmed when ADA Montford called the

---

[5]     A video of DA Moore's February 4, 2019 presentation is available at http://austintx.swagit.com/play/02042019-882 (last visited on September 9, 2019). During that presentation, DA Moore spoke at length about the Interagency Sexual Assault Team ("**ISAT**"), which is governed by an executive committee that is composed of designated representatives from, among other places, the DA's Office and the APD. A true and accurate copy of an ISAT memorandum of understanding is attached as **Exhibit C**. The ISAT memorandum of understanding strongly supports the inference that the DA's Office has a formal policy requiring that information regarding sexual assault victims be treated as strictly confidential. *See, e.g.*, Ex. C at 4 ("Participation in discussions of a sensitive nature will be limited and will require a signed release form from victims/survivors being discussed as well as an agreement of confidentiality signed by the stakeholder.").

[6]     The County Attorney, who represents DA Moore in the Class-Action Lawsuit, sent the proposed waiver to the media outlet and stated, "[p]rivacy protections significantly limit what can be discussed. Please let the District Attorney's Office know if you are able to obtain an executed release." The reporter then properly reached out to Emily's counsel. True, accurate, and slightly redacted copies of February 2019 emails among L. Dipple, N. Hamdan, E. Myers, and J. Ecklund are attached as **Exhibit D**. These communications further substantiate the existence of a general policy of the DA's Office not to disclose private information regarding sexual-assault survivors without those survivors' permission.

Third Party to disparage her; repeatedly lie; and falsely, but unequivocally, convey that she consented to the worst experience of her life. Emily was further traumatized and harmed when DA Moore publicly said there was no impropriety in this outrageous misconduct, thereby stamping said misconduct with the imprimatur of the DA's Office. Both ADA Montford and DA Moore used the perceived authority and credibility of the DA's Office to undermine Emily and disparage her. Specifically, they made statements suggesting that Emily's sexual "choices" would embarrass her and hurt her family, and necessarily accused Emily of both falsifying a police report and frivolously joining the Class-Action Lawsuit.[7]

24.     The law does not permit a District Attorney and her First Assistant to deliberately and casually lie in order to disparage a victim who happens to be a part of a civil lawsuit against their office. The facts are remarkably clear: Emily consistently maintained that she never consented to sexual contact with her assailants; and that she was threatened, physically harmed, and in fear for her life for the duration of her captivity. Nevertheless, the Defendants ignored their obligations as public servants, attorneys, and simply as human beings when they decided to falsely accuse Emily, and to disparage the credibility and character of the very victim they previously refused to help.  In so doing, they also violated prosecutorial ethics, the internal policies of the DA's Office, and both federal and state law.

---

[7]     *See, e.g.*, Ex. A at 5:24–6:5 ("[I]f you need to talk to [Emily's] family and tell them that you talked to me I would just appreciate if you kept [it] in, like, general terms. . . . Plus, because I think they would be mortified about some of this stuff about their daughter, so I don't want, um, I don't want to hurt them any more than they've already been hurt, but, um, anyway, because it's you I'm going to tell you kind of the nuts and bolts of it. Um, so you knew what we were up against."); *id.* at 15:23–16:7 ("Well, and I also would be interested if, if—I don't know [how] much they weren't sharing with the family to protect her. Um, so I'd be interested in talking to her, you know, in a one-on-one…and then asking what we could share with the family…it's almost better to have the family pissed off at us rather than disappointed in her, you know."); *id.* at 23:9–14 (chastising the plaintiffs in the Class-Action Lawsuit (including Emily) for, in ADA Montford's words, "acting in ways that I don't think are appropriate for victims" and "creat[ing] fear in people").

<u>CLAIMS FOR RELIEF</u>

**Count 1:     Violations of Equal Protection and Due Process – 42 U.S.C. § 1983 (against all Defendants)**

25.     Plaintiff Emily Borchardt incorporates the preceding paragraphs as if set forth fully herein.

26.     The Equal Protection Clause of the United States Constitution permits redress of "intentional and arbitrary discrimination" through a class-of-one claim where, as here, a person is "intentionally treated differently from others similarly situated and where there is no rational basis for such treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). A plaintiff proves a class-of-one claim by showing "[i] he or she was treated differently from others similarly situated and [ii] there was no rational basis for the disparate treatment." *Stotter v. Univ. of Texas at San Antonio*, 508 F.3d 812, 824 (5th Cir. 2007).

27.     Here, in an effort to discourage Emily from exercising her constitutional right to vindicate other constitutional rights via the Class-Action Lawsuit, ADA Montford shared intimate (and false) information regarding Emily's case with the Third Party, who is a member of the public. DA Moore then told the world that ADA Montford did nothing wrong in so doing, thereby endorsing the false statements as true. The Defendants did this despite the apparent existence of a policy in the DA's Office not to release such information without a waiver from a victim.

28.     Unless the Defendants regularly ignore their own internal victim privacy policies, ADA Montford's call, and DA Moore's ratification of it, constitute adverse differential treatment of Emily as compared to other victims of violent crime. This differential treatment caused Emily damage in an amount that she will prove at trial.

29.     There are several reasons that the Defendants' treated Emily differently from other victims of violent crime. First, Defendants did so to protect themselves from potential legal

liability in the pending Class-Action lawsuit. Second, Defendants did so because of their disdain for the plaintiff class of women (including Emily), who are pursuing their constitutional rights via the Class-Action Lawsuit. Third, the Defendants treated Emily differently to preserve their own professional and political ambitions. The Defendants' differential treatment of Emily is not supported by a rational basis sounding in any legitimate governmental interest. Indeed, it defies credulity to assert that there could ever be a legitimate governmental interest in lying about a victim of sexual assault to her friends, family, and the world.

30.     Defendants also acted with vindictive animus and/or an improper motive. The Defendants' misconduct was motivated out of animus towards Emily for her legal claims (and the threat those claims pose to their careers). The Defendants' misconduct was also motivated out of a desire to prevent Emily from exercising her constitutional right to continue to pursue other constitutional rights via the Class-Action Lawsuit.

31.     Defendants' violations of Emily's equal protection and due process rights are actionable under 42 U.S.C. § 1983, because, as ADA Montford and DA Moore previously argued in court, their actions were done under color of state law and in the scope of their employment within the DA's Office.[8] *See, e.g.*, Ex. E at ¶¶ 45, 55.[9]

---

[8]     If ADA Montford and DA Moore were not, in fact, acting within the scope of their duties when they committed the conduct complained of, then Emily's claims are properly brought against them in their individual capacities. Emily is therefore pleading an alternative defamation claim against ADA Montford and DA Moore in their individual capacities.

[9]     ADA Montford and DA Moore made these representations through their counsel to a Texas state district court within the last six months. A true and accurate copy of that filing—"Respondents Montford, Moore and Shea's Plea to the Jurisdiction and in the Alternative, Motion to Dismiss Pursuant to Texas Citizens Participation Act, Chapter 27, Texas Civil Practice and Remedies Code Petitioner's Verified TRCP 202 Petition for Pre-Suit Depositions"—is attached as **Exhibit E**.

**Count 2:**     **Conspiracy to Violate Civil Rights – 42 U.S.C. § 1985 (against ADA Montford and DA Moore)**

32.     Plaintiff Emily Borchardt incorporates the preceding paragraphs as if set forth fully herein.

33.     ADA Montford and DA Moore conspired with each other, in violation of 42 U.S.C. § 1985(2), to (i) deter Emily, by intimidation or threat, from participating in the Class-Action Lawsuit; (ii) limit Emily from testifying freely, fully, and truthfully in the Class-Action Lawsuit; and (iii) inflict injury upon Emily as retribution for participating in the Class-Action lawsuit.

34.     ADA Montford and DA Moore each took affirmative steps in furtherance of that conspiracy, including but not limited to, (i) ADA Montford's false statements on the September 14, 2018 call, and (i) DA Moore's ratification of those statements in the updated March 4, 2019 news article. ADA Montford and DA Moore, by the conduct alleged, intentionally sent the message to Emily that, if she did not give up her claims and cease her participation in the Class-Action Lawsuit, then they would defame and embarrass her publicly.

35.     ADA Montford and DA Moore acted with a purposeful intent to violate Section 1985(2) because their harmful actions were motivated by (i) their animus against Emily for participating in the Class-Action Lawsuit; (ii) their desire to prevent Emily from exercising her constitutional right to vindicate her own rights and those of the class in the Class-Action Lawsuit; and (iii) their willingness to protect themselves at all costs, including by interfering with Emily's exercise of her constitutional rights by trying to intimidate her out of pursuing the Class-Action Lawsuit.

36.     These actions caused Emily trauma, injury, and damages in an amount she will prove at trial.

**Count 3:**       **Defamation (against ADA Montford and DA Moore)**

37.     Plaintiff Emily Borchardt incorporates the preceding paragraphs as if set forth fully herein.

38.     The elements of defamation are: "[i] the publication of a false statement of fact to a third party, [ii] that was defamatory concerning the plaintiff, [iii] with the requisite degree of fault, and [iv] damages, in some cases." *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015).

39.     ADA Montford made several false statements of fact to the Third Party, which are set out in Paragraph 17. Specifically, ADA Montford falsely stated that (i) Emily consented to sex with her assailants during the twelve hours that she was tortured; and (ii) that Defendants had documentary evidence that Emily admitted to consenting.

40.     Additionally, DA Moore publicly ratified ADA Montford's misconduct and lies, conveyed the impression that ADA Montford was being truthful, and communicated to the public that Emily's allegations regarding the criminal assaults perpetrated against her were false. This resulted in a second and ongoing defamation of Emily by a separate defendant.

41.     ADA Montford's statements, and DA Moore's public ratification of them, necessarily implied that Emily committed a criminal offense by making false accusations of sexual assault. Additionally, the statements necessarily imply sexual misconduct, a point plainly evidenced by ADA Montford's repeated references to how mortifying or embarrassing the revelation of the so-called truth would be. False accusations of either criminal or sexual misconduct are *per se* defamation in Texas.

42.     Due to their stated familiarity with the case and their ability to access the underlying investigative documents (including the APD's Police File), ADA Montford and DA Moore either knew that their statements were false, or should have been aware that the statements were false

because the APD's Police File directly contradicts them. Thus, ADA Montford's statements, and DA Moore's ratification of them, were either knowingly false or perpetrated with reckless disregard for whether those statements were true or false.

43.     ADA Montford and DA Moore were not acting in the scope of their employment when they made and/or ratified the false statements about Emily. Indeed, ADA Montford expressly stated during the phone call that (i) she could not provide the information that she provided, and (ii) that she provided said information in her personal capacity:

- "I would not give what I'm about to give you to anybody, just anybody. I'm doing it, we go so far back, so I'm going to give you the nuts and bolts of this, *but just know I'm not really supposed to be talking about this stuff publically* . . . ." Ex. A at 5:19–22 (emphasis added).

- "And that's why *I wanted to give you all of this stuff I'm not allowed to talk about right now* . . . ." *Id.* at 13:5–6 (emphasis added).

- "I think you can [tell Emily's family], you know, that you called me and you heard it from the horse's mouth, you know, what happened, and that I've offered to sit down and talk with them, but I can't do it while the lawsuit[] [is] pending. . . . *And, I can't even talk about the case with you*. But, that in general terms, we had a conversation." *Id.* at 17:19–25 (emphasis added).

- **Third Party:** "I can say *this is a personal conversation, not like a business conversation*."

    **ADA Montford:** "*Exactly*." *Id.* at 18:3–5 (emphasis added).

44.     DA Moore's and ADA Montford's misconduct has caused Emily extraordinary mental anguish, in an amount that she will prove at trial. And because DA Moore's and ADA Montford's statements were either knowingly false or made with reckless disregard to their truth or falsity, Emily is also entitled to punitive damages.

## JURY DEMAND

45.     Emily hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

## PUNITIVE DAMAGES

46.     All of the acts committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, and/or recklessly, and said acts meet the standards required for the imposition of punitive damages.

## ATTORNEYS' FEES

47.     Emily is entitled to recover her reasonable and necessary attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law.

## CONCLUSION AND PRAYER FOR RELIEF

Emily respectfully requests and prays for the following:

a.      Judgment finding Defendants liable for violations of 42 U.S.C. §§ 1983 and 1985, which entitles Emily to monetary damages, or, in the alternative, a judgment finding ADA Montford and DA Moore individually liable for defamation, which also entitles Emily to monetary damages;

b.      Judgment awarding Emily the costs of this lawsuit;

c.      Judgment awarding Emily her attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable law;

d.      Judgment awarding Emily pre- and post-judgment interest as allowed by law; and

e.      All relief, in law or in equity, to which Emily has shown herself to be entitled.

DATED: September 11, 2019

Respectfully submitted,

By:    */s/ Jennifer R. Ecklund*

        Jennifer R. Ecklund
        Texas Bar No. 24045626
        Jennifer.Ecklund@tklaw.com

        Alexander T. Dimock
        Texas Bar No. 24094628
        Alex.Dimock@tklaw.com

        John P. Atkins
        Texas Bar No. 24097326
        John.Atkins@tklaw.com

**THOMPSON & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Facsimile:  (214) 969-1751

        Elizabeth G. Myers
        Texas Bar No. 24047767
        Elizabeth.Myers@tklaw.com

**THOMPSON & KNIGHT LLP**
98 San Jacinto Boulevard, Suite 1900
Austin, Texas 78701
Telephone: (512) 469-6100
Facsimile:  (512) 469-6180

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

On September 11, 2019, I electronically submitted the foregoing document to the Clerk of the Court for the United States District Court for the Western District of Texas using the electronic case filing system of the Court.

        */s/ Jennifer R. Ecklund*
        Jennifer R. Ecklund